# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

KENNETH D. MATHEIS,

       Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

No. C08-4055-MWB

**REPORT AND RECOMMENDATION**

---

## *I. INTRODUCTION*

The plaintiff Kenneth D. Matheis seeks judicial review of a decision by an administrative law judge ("ALJ") denying his applications for disability insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and for supplemental security income ("SSI") under Title XVI of the Act. Matheis claims the ALJ erred in giving improper weight to the opinions of treating and consulting medical sources, making an incorrect determination of Matheis's residual functional capacity, and posing an inaccurate hypothetical question to the Vocational Expert. (*See* Doc. Nos. 11 & 15)

## *II. PROCEDURAL AND FACTUAL BACKGROUND*
### *A. Procedural Background*

On October 28, 2004, Matheis protectively filed applications for DI and SSI benefits, alleging a disability onset date of January 1, 2001. (R. 73-79; *see* R. 16) He claims he is disabled due to depression and "a social phobia." (R. 89) His applications were denied initially (R. 48-51, 293-96), and on reconsideration (R. 40-46, 288-92).

Matheis requested a hearing, and a hearing was held on June 14, 2007, before an Administrative Law Judge ("ALJ"). (R. 303-43) Matheis was represented at the hearing by non-attorney Lee Sturgeon. Matheis testified at the hearing, and Vocational Expert

("VE") Anita Howell also testified. At the hearing, Matheis amended his alleged disability onset date to August 30, 2004. (R. 307) On November 13, 2007, the ALJ found that although Matheis cannot return to any of his past relevant work, he retains the functional capacity to perform other work, and he therefore is not disabled. (R. 16-25) Matheis appealed the ALJ's ruling, and on May 22, 2008, the Appeals Council denied his request for review (R. 8-11), making the ALJ's decision the final decision of the Commissioner.

Matheis filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 4) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. The Commissioner filed an Answer on September 15, 2008. Doc. No. 6) Matheis filed a brief supporting his claim on November 11, 2008. (Doc. No. 11)

On February 9, 2009, the Commissioner filed a responsive brief, coupled with a "Motion to Reverse and Remand and for Entry of Final Judgment." (Doc. No. 14) In the brief, the Commissioner "agrees with the factual assertions contained in [Matheis's] brief, as well as the ALJ's summary of the medical evidence and hearing testimony[.]" (*Id.*, p. 2) The Commissioner does not discuss the merits of Matheis's case. He indicates the Appeals Council has decided remand is appropriate for further consideration of the case, and he then sets forth the general law relating to when remand is appropriate. He argues "the necessity for remand was not discovered until the case reached [the Commissioner's] legal counsel for briefing," and "[r]emand would expedite administrative review, ensure that the Commissioner properly considers [Matheis's] claim, and could make further judicial review unnecessary." (Doc. No. 14, p. 5)

Matheis filed a reply brief (Doc. No. 15), in which he resists the Commissioner's motion for remand. Matheis argues the Commissioner had ample opportunity to review his claim, but failed to do so. He further argues it would be unjust to require him to wait any longer for a full and fair adjudication of this claim when the record already contains

substantial evidence to support an immediate finding of disability and award of benefits. (*Id.*)

The case is now fully briefed, and the court turns to consideration of the case.

### B. Factual Background

#### 1. Introductory facts and Matheis's hearing testimony

Matheis was born in 1966, and was forty years old at the time of the hearing. (R. 306) He lives alone in low income housing in Sioux Center, Iowa. (R. 313) He completed the ninth grade in school, and later earned a G.E.D. He has no problems reading and writing, but he has problems retaining what he has read which, according to him, caused him not to do very well in school. (R. 311) He also had problems socially in high school, and he used drugs in his teens, but he stated he has not used any drugs for at least the past fourteen years. He drinks about "three beers a year." (R. 312)

Matheis worked from 1997 until August 30, 2004, for an electrical firm. According to him, he was able to continue working that long because his employer, Don Tenaple (*see* R. 320), was a close family friend and mentor, and he made accommodations for Matheis's frequent absences and other problems until Tenaple no longer felt able to do so. (R. 314-15; *see* R. 179) Tenaple completed a Work Performance Assessment on May 31, 2007, that indicates Matheis had impairments that affected his ability to work, and Tenaple accommodated those impairments in the following ways: having other employees assist Matheis with some tasks, giving him tasks especially suited to his limitations, scheduling work hours to accommodate his needs, tolerating a lower standard of productivity and a higher degree of errors than expected from other employees, providing more direct supervision than given to other employees, repeating simple instructions and procedures frequently, and tolerating "a much higher absenteeism rate" than was allowed for other employees. (R. 179) Tenaple further indicated Matheis had difficulty with attention and

concentration, work pace, memory, and the ability to work with coworkers and the public. (*Id.*)

Since Matheis was fired by the electrical company, he has worked occasionally at "spot jobs" doing electrical and carpentry work. The jobs often arose as the result of referrals from Tenaple. He also tried working part-time as a cashier on two occasions, but he was unable to learn the job. Despite having worked at numerous small jobs since 2004, he has not earned income at the substantial gainful activity level. (R. 315-17; R. 18 ¶ 2) He stated that since his alleged onset date, he has been unable to work full-time at any job due to depression and anxiety symptoms that cause him not to be dependable. (R. 318) He does relatively well when he is able to work alone; however, he has a high incidence of tardiness and absenteeism. He stated he sometimes gets up in the morning, "everything shuts down," and he "crawl[s] back in bed and sleep[s] for three days." (R. 321) Tenaple told Matheis to call and tell him when Matheis was unable to come to work, but at times Matheis was unable even to place the call. (R. 322) Tenaple sometimes came to Matheis's home to check on him, and Matheis "would talk to him through the door because [he] couldn't face him." (R. 323)

Matheis stated his current medications are helpful, but he still has days when he is unable to leave the house. The medications have improved his symptoms so that he only stays in bed for a day, rather than three days, and this occurs about one day per week. (*Id.*) On the remaining four workdays each week, he has good days and is productive. He stated it took several years for his doctor to find medications that would work well for him. At the time of the hearing, he was taking Wellbutrin, Lexapro, and Abilify, and that combination of medications had provided the most improvement for him. (R. 324-25) Matheis sees his doctor, Dr. Bahnson, every three months. Dr. Bahnson is his only treating doctor. (R. 309)

Matheis occasionally does "hurricane relief and other various volunteer projects," sometimes through his church and sometimes through other organizations. (R. 308, 325)

His expenses are paid, but he is not paid a salary for doing the work. (R. 325) He spends between three and six weeks a year doing the volunteer work. (R. 326)

Other than his volunteer work, Matheis has few activities that involve other people. (*Id.*) He enjoys being around people initially, but then he will have an anxiety attack and he is "done for." (R. 334) Although he participates in the church-sponsored volunteer activities, he avoids church services because they bring on anxiety attacks. (R. 334-35) He spends time with his parents, and three of his sister's children "usually pop in once a week" to "pester [him] in their own cute way." (R. 326) Matheis's parents live nearby, but they do not check on him every day. (*Id.*) He stated his parents had paid for his medical treatment for the year prior to the ALJ hearing because he was unable to afford treatment, and he feels incompetent because he owes his parents so much money. (R. 309-10; R. 327) When he does see his doctor, whose office is fifty miles from Matheis's home, Matheis drives and usually one of his parents accompanies him. (R. 328) He used to drive to the doctor's office by himself, but for the year-and-a-half prior to the hearing, he had been unable to afford the gas. (*Id.*)

On an ordinary day, Matheis watches "an awful lot of TV." (R. 329) He also enjoys building 1:24 scale model cars. The hobby allows him to "focus in on just one little part of [his] life," without worrying about anything else. (R. 330)

Matheis stated he has difficulty concentrating and he has memory problems. When someone gives him instructions on a job, he has to write them down or he will forget them almost immediately. He often has to have instructions repeated two or three times. According to Matheis, when he worked for Tenaple, Tenaple usually accompanied him to the job site and walked him through what he would have to do that day. He stated that even after seven years of working at the job, there are still things he is unable to remember without consulting his notes. (R. 332-34)

### b.    *Matheis's medical history*

Several mental health tests were administered to Matheis.  On September 15, 2004, he took the Millon Clinical Multiaxial Inventory-III (MCMI-III).  (R. 235-44)  The test indicated Matheis lacks appropriate coping strategies and a foundation for socially-acceptable interpersonal conduct.  He has fluctuating attitudes and behaviors that, despite his general ability to function satisfactorily, may cause him to "experience periods of marked emotional, cognitive, or behavioral dysfunction."  (R. 238)  He has low self-esteem and isolates himself from others.  When he does interact with others, he may experience "impulsive outbursts, and chronic moodiness."  (*Id.*)  He evidenced "a chronic pattern of moderate depression," and a possible anxiety disorder.  (R. 239)  Based on the test results, he was diagnosed with Dysthymic Disorder, Adjustment Disorder with Anxiety, Schizoid Personality Disorder, and Avoidant Personality Disorder with Paranoid Personality Features and Antisocial Personality Features.  (R. 241)  On September 27, 2004, Matheis repeated the MCMI-III test, and the results were consistent with the previous MCMI-III.  (R. 208-16)

On September 27, 2004, Matheis took the Minnesota Multiphasic Personality Inventory 2 (MMPI-2).  Notes indicate the test "should be interpreted with caution," because of the "possibility that the clinical report is an exaggerated picture of [Matheis's] present situation and problems."  (R. 219)  He presented "an unusual number of psychological symptoms . . . [that] could result from poor reading ability, confusion, disorientation, stress, or a need to seek a great deal of attention for his problems."  (*Id.*)  He was noted to be introverted and interpersonally avoidant, with cynical views about life and difficulties engaging in group activities.  The evaluator indicated individuals with similar profiles are not good candidates for psychological treatment because they "resist behavior change and tend to terminate treatment early when their situational stress is reduced."  (R. 221)  The evaluator further opined Matheis's "personality style would not be easy to alter."  (*Id.*)

6

On December 20, 2004, Berne B. Bahnson, M.D. wrote an opinion letter regarding the results of Matheis's neuropsychometric testing. (R. 271-72) He indicated Matheis's test results were "consistent with a schizoid personality." (R. 271) He opined that in order to work, Matheis would have to "find a career which required minimal social involvement and maximum routine." (*Id.*) He explained:

> Relative social isolation is a better fit for his avoidance and schizoid tendencies. Routine is a better fit for his ambivalence, e.g. such activity minimizes decision making. A job with minimal social involvement and maximum routine . . . will seem less stressful to [Matheis] and he would be more likely to follow through and, therefore, have some success in maintaining continuity. Schizoid individuals also do better in environments where there is less conflict or expressed emotion. For example, a position as a night watchman would be ideal. If [Matheis] could maintain continuity in a job and be rewarded sufficiently from an economic standpoint it would help to improve his self-confidence and presumably there would be fewer issues relative to depression and anxiety.

(R. 271-72) The doctor further indicated Matheis could benefit not only from medications, but also from ongoing counseling providing cognitive behavioral and supportive approaches. (R. 272)

On December 28, 2004, Denise Marandola, Ph.D. conducted a mental status exam of Matheis at the request of the state agency. (R. 245-49) In the course of her evaluation, Dr. Marandola administered the Beck Anxiety Inventory, which indicated a "moderate range of anxiety." (R. 248) She also administered the Beck Depression Inventory-II, which indicated a "severe range of depression." (*Id.*) She diagnosed Matheis with a Major Depressive Disorder, Severe without psychotic features; Social Phobia, Generalized; Avoidant Personality Disorder; and dependence on cannabis, alcohol, and amphetamines, all in full remission. She assessed his current GAF at 42, indicating severe symptoms. (*Id.*)

Dr. Marandola reached the following conclusions regarding Matheis's work-related abilities:

> As far as his ability to remember and understand instructions, procedures and locations, [Matheis] would likely function in the average range, as he appears to be of at least average intelligence and seemed to recall information fairly well during this Interview.

> As far as ability to carry out instructions, maintain concentration and pace, his attention and concentration were somewhat impaired during this evaluation, most likely due to anxiety. He lost track during serial 7's, recalled only two out of three words after a brief delay (and one was a word-form instead of the exact word) and made one error in completing a 3-step task. Pace was within normal limits.

> As far as ability to interact appropriately with supervisors, co-workers and the public, he was well-groomed and cooperative, but noticeably anxious. He would likely have a great deal of difficulty interacting with supervisors, co-workers and the public.

> As far as ability to use good judgment and respond appropriately to changes in the work place, [Matheis] appears to have poor judgment based upon his legal history, substance use problems and decision to simply not eat rather than going out or problem-solving how to get groceries to his apartment. He has extreme difficulty with change, due to anxiety and would likely have trouble responding to changes in a work environment.

> As far as ability to handle funds, [Matheis] would likely need a payee to help him manage funds if he does receive disability benefits, due to his extreme social difficulty and self-stated lack of "math skills."

(R. 248-49)

On January 17, 2005, Rhonda Lovell, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (R. 250-63), and a Mental Residual Functional Capacity Assessment form (R. 264-67). In her review commentary, Dr. Lovell noted

Matheis "appears to have a severe mental impairment that does not meet or equal a referenced listing." (R. 268) She opined he would be able to understand and remember instructions and procedures for basic and detailed tasks; tolerate limited interactions with a small number of familiar coworkers; and, "with continued medications . . . experience no more than moderate periodic difficulties regularly completing a typical work week." (R. 268)

On April 27, 2005, Dr. Bahnson wrote another opinion letter regarding Matheis's condition. (R. 269-70) He indicated Matheis had been his patient since May 2002, and had "been involved in regularly scheduled outpatient follow up appointments for medication management." (R. 269) He stated Matheis was being treated with Lexapro and Wellbutrin for depression, and Abilify "for management of his anxiety and symptoms of his schizophrenic spectrum disorder." (*Id.*) Although Matheis's depression had responded well to medications, the doctor indicated his social anxiety and schizoid features had "remained fairly intractable to pharmacologic intervention," preventing Matheis from being able to maintain gainful employment and independent living. (*Id.*) The doctor opined Matheis's condition was unlikely to improve beyond his current level. (*Id.*)

Regarding Matheis's ability to function in the workplace, Dr. Bahnson opined as follows:

> The patient has no significant problem with memory or understanding instructions. He does, however, have significant frontal lobe dysfunction which creates problems for him in carrying out instructions, maintaining attention, and/or concentration. He is socially awkward with supervisors, coworkers and the public. He tends not to use good judgement or respond appropriately to changes in the work place. The patient has repeatedly demonstrated an inability to handle his own finances. Currently, they are being managed by his parents.

(*Id.*)

On May 12, 2005, Lon Olsen, Ph.D. reviewed the record in connection with Matheis's request for reconsideration, and completed a Psychiatric Review Technique form (R. 184-97), and a Mental Residual Functional Capacity Assessment form (R. 198-201). Dr. Olsen found there was no evidence in the record to support Dr. Bahnson's statement that Matheis has "significant frontal lobe dysfunction." He further indicated the tests administered to Matheis – the MMPI-2 and the MCMI-III – were not appropriate instruments to diagnose such a condition. (*Id.*)

Dr. Olsen further discounted Dr. Bahnson's opinion that Matheis would have difficulty carrying out instructions, maintaining attention and concentration, interacting with others, using good judgment, and adjusting to changes in routine, finding these opinions were neither "supported by treatment notes" nor "entirely consistent with other facts of the file." (*Id.*) He noted Dr. Bahnson had recommended Matheis "seek work that would require little social interaction and that would provide a predictable routine with minimal, if any, decision-making demands." (*Id.*) He further noted that both Dr. Bahnson and Matheis's mother had indicated Matheis's condition was improving with medication management. (*Id.*)

Although Dr. Olsen found Matheis has a medically-determinable impairment, he opined this would not prevent Matheis from working, noting as follows:

> He is independent for all self-cares, performs some daily activities, interacts with others on a superficial basis, and engages in purposeful activity when he is motivated to do so. His family reports some improvement in his condition with psychiatric treatment. He would not be able to interact with the public. He would have some difficulty maintaining attention and concentration, working near others without being distracted by them, interacting with coworkers, responding to criticism from supervisors, and adjusting to changes in routine. He would be capable of activities that did not require sustained

> vigilance, contact with the public, extensive contact with
> coworkers, intense supervisory oversight, or frequent changes
> in routine.

(R. 200-01)

Matheis saw Dr. Bahnson on June 2, 2005, "for follow-up of his schizophrenic spectrum disorder." (R. 279) Matheis's father accompanied him to the appointment. Matheis was "doing reasonably well," doing freelance work referred from Tenaple. The doctor noted Tenaple was used to Matheis's pattern of working reliably for a week or two, and then not showing up for work a couple of days in a row. Matheis's mother was managing his finances. Notes indicate Matheis "sometimes lets himself run out of his medications instead of being responsible to make sure that his sample supply is adequate." (*Id.*) He was experiencing some stomach pains that the doctor opined could be due to the inconsistent medication use, taking medications on an empty stomach, or stress and anxiety. His medications were continued without change. (*Id.*)

Matheis returned to see Dr. Bahnson on August 16, 2005. (R. 278) He continued to subcontract electrical work and also was doing some freelance jobs for friends and family. His work absenteeism had improved significantly, down to one or two days per month. He also had been on a couple of trips with his family. His medications were continued without change. (*Id.*) Matheis next saw Dr. Bahnson on November 15, 2005, with little change from his August 2005 follow-up appointment. (R. 277) He continued to do well, and when he saw Dr. Bahnson for follow-up on February 13, 2006, notes indicate Matheis looked "great," and he had quit smoking. (R. 276)

Matheis saw Dr. Bahnson on May 15, 2006, for follow-up. (R. 275) He was concerned because he had not been getting a lot of work. He had an opportunity to move to Biloxi, Mississippi, to do work for a church organization, but he had concerns about making such a move. Notes indicate he had been to Biloxi "on a church crusade," which had led to the job offer. (*Id.*)

When Matheis next saw Dr. Bahnson, on August 15, 2006, he reported that he had taken some trips with family and he was doing well. He had done some electrical work through word-of-mouth contacts and had prospects for additional work in the coming months. (R. 274)

At Matheis's next follow-up appointment, on November 13, 2006, he reported some conflict with his mother, who handled his finances. Matheis's mother wanted to accompany him to his appointment, but the doctor noted Matheis "likes to come up on his own because in addition to re-evaluating his medications, it gives him a chance to go to some of the trade businesses like Menards and Home Depot and window shop." (R. 273) Matheis had been very busy with work, and he had plans to travel to Mexico in January, and to Mississippi in February. Matheis suggested he might move out of Iowa to get away from his mother, whom he found to be controlling and somewhat patronizing. Notes also indicate Matheis's parents were "very apprehensive about him relocating to Mississippi because it would jeopardize his Social Security disability application in the state of Iowa." (*Id.*) They also expressed concerns about whether Matheis would make it on his own in Mississippi. (*Id.*)

c.    *Vocational expert's testimony*

The ALJ asked VE Anita Howell to consider an individual with Matheis's past relevant work, a high school education, no physical functional limitations, and the following mental functional limitations, all of which were "predicated upon work that can be . . . learned in less than 30 days":

> With regard to understanding . . ., remembering and carrying out detailed instructions, if the instructions are written and accessible to this individual, there is a moderate limitation. If they're not written down [and] accessible to this individual, it's a marked limitation. If the judgment is on simple work related decisions, it's a moderate limitation. If the instructions are written down, it's a slight limitation. Interacting

appropriately with the public under any circumstances is marked. There's more. With co-workers, if contact with co-workers is brief, superficial and related to job function and is no more than occasional, it's moderate. The limitations with regard to supervisors are the same as with co-workers. There's more. . . .

Responding to changes in a usual work setting is moderate. Responding to work pressure in a usual setting is also moderate. Given this residual functional capacity, is there any work in the national economy that this person can perform?

(R. 338-39) The VE indicated the hypothetical individual could perform some jobs, limited to unskilled work. She gave examples of commercial janitor, assembler, and hand packager. (R. 339)

The ALJ next asked the VE to consider the same individual, but with the following limitations: "The ability to respond to work pressure in usual work setting is markedly limited, and the ability to respond appropriately with the public is extremely limited, and the ability to respond appropriately to co-workers is moderate to marked." (R. 340) The VE indicated this hypothetical individual would be unable to maintain employment on a consistent basis. (*Id.*)

The VE indicated that if an individual had the functional limitations found by Dr. Bahnson (*see* R. 280-85), Matheis's treating psychiatrist, then the individual would be unable to sustain gainful employment. (R. 341)

### d. The ALJ's decision

The ALJ found that Matheis has no physical impairments (R. 19), but he has a severe combination of mental impairments consisting of "a Major Depressive Disorder, a Generalized Social Phobia, a disorder containing features of the schizophrenic spectrum, and an avoidant personality disorder." (R. 18) The ALJ further found that Matheis's impairments, singly or in combination, do not rise to the Listing level of severity. (R. 19)

In addition, the ALJ found that although Matheis has a history of using alcohol, marijuana, and methamphetamines, it appears, "[a]s far as the paucity of the medical record reflects," that his substance abuse "remains in a state of complete and sustained remissions" and is "not material to the determination in this case." (R. 18, 342)

The ALJ found Matheis experiences moderate restrictions in his activities of daily living. He "has anxiety around people, keeps to himself, has difficulty leaving his residence and is subject to extended periods of depression during which time he is anhedonic." (R. 19) The ALJ further found Matheis has moderate difficulties in social functioning, noting "he wants to be alone, [and] has difficulty in his personal relationships." (*Id.*) The ALJ also found Matheis has moderate difficulties with regard to concentration, persistence, or pace, noting Matheis's "anxiety attacks and paranoia affect him when he is around people," but he "has experienced no episodes of decompensation." (*Id.*)

Finding Matheis's symptoms do not meet the severity criteria of any of the mental health listings, the ALJ concluded as follows regarding Matheis's ability to work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he has no limitation on the ability to understand[,] remember and carry out short, simple instructions; his ability to understand[,] remember and carry out detailed instructions if those instructions are written and accessible to him is moderately limited; his ability to make judgment on simple work-related decisions is moderately limited, unless those instructions are written down [and] available to him in which case [his] limitations are mild; his ability to interact appropriately with the public is markedly limited; his ability to interact appropriately with coworkers is moderately limited; his ability to interact appropriately with supervisors if the interaction is brief, superficial, and directly related to his job processes is moderately limited;

his ability to respond appropriately to work pressure and to changes in a usual work setting is moderately limited.

(R. 20)

The ALJ found Dr. Bahnson's opinions regarding Matheis's functional abilities to be "considerably inconsistent" with Matheis's activities, such as traveling out of state to perform volunteer work, and driving himself to and from South Dakota for doctor's visits. The ALJ also noted that both Dr. Bahnson and the MMPI test administrator indicated Matheis's condition would be "amenable to psychiatric therapy of which [Matheis] had virtually none." (R. 21) The ALJ went on to observe that instead of seeking out psychiatric therapy, Matheis "saw the neuropsychiatrist and drove his car for an hourly appointment, only every 60 days." (*Id.*) The ALJ further attributed Matheis's difficulties with the activities of daily living, concentration, persistence, pace, and social functioning, in large part to the fact that he "was not being adequately treated for his condition." (*Id.*) The ALJ indicated he was "convinced" that if Matheis had obtained psychiatric treatment, Matheis's "functional abilities would be considerably less limiting." (R. 22) As a result, the ALJ did not give controlling weight or great weight to Dr. Bahnson's opinion regarding Matheis's functional abilities. (*Id.*)

The ALJ further discounted the opinions of the state agency consultant that Matheis would be able to "tolerate limited interaction with a small number of familiar coworkers [over a] period of time[.]" (*Id.*) The ALJ found this conclusion to be "directly in opposition to the findings of both the MMPI and Dr. Bahnson." (*Id.*) The ALJ concluded that with the inconsistent opinions, he was required to "fashion residual functional capacity that reflects [Matheis's] condition had he received adequate treatment." (*Id.*)

The ALJ found Matheis's subjective allegations regarding "the intensity, persistence and limiting effects of [his] symptoms [were] not entirely credible." (R. 24; *see* R. 22-24) The ALJ again noted that had Matheis received appropriate treatment, he would have had the residual functional capacity set forth above. (R. 24) He found Matheis had not put

forth an adequate effort in seeking out "other sources . . . of local treatment which could be obtained at a higher frequency," or "other private sources less expensive than Dr. Bahnson [who] were available in his local area." (*Id.*)

The ALJ concluded that Matheis's mental impairments would prevent him from performing any of his past relevant work, but based on the VE's testimony, Matheis would be able to perform other work such as commercial janitor, assembler, and packager. The ALJ therefore concluded Matheis is not disabled. (R. 24-25)

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). First, the Commissioner will consider a claimant's work activity. If the

claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the

presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in

significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

### B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484

F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo.*" *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported

an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)   the claimant's daily activities;
> 2)   the duration, frequency and intensity of the pain;
> 3)   precipitating and aggravating factors;
> 4)   dosage, effectiveness and side effects of medication;
> 5)   functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. DISCUSSION

Matheis argues the ALJ erred in failing to give controlling weight to Dr. Bahnson's opinions regarding Matheis's mental functional limitations. He also argues the ALJ erred in failing to give appropriate weight to Dr. Marandola's consulting opinion that Matheis would have "a great deal of difficulty" interacting with supervisors, coworkers and the public. Matheis argues Dr. Marandola's use of the phrase "a great deal of difficulty" is closer to a "marked" limitation than to the "moderate" limitation assigned by the ALJ. Matheis further argues the ALJ erred in failing to give appropriate weight to the MMPI test results. (Doc. No. 14)

In his resistance to the Commissioner's motion to remand, Matheis reiterates these same arguments. He also argues the Commissioner had ample opportunity to consider the evidence in this case during the administrative process, and he should not be required to wait for another lengthy period of time before a final decision is made in the case.

It is clear from the ALJ's opinion that he substituted his own opinions for those of Matheis's treating physician and even that of the consulting physician, something the law of the Eighth Circuit prohibits. *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990) (citing *Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir. 1989)); *accord Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir. 2008) (citing *Ness*). An ALJ may only reject a treating physician's opinion when it is inconsistent with the medical evidence of record, taken as a whole. *Finch*, 547 F.3d at 938 (citing *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002)).

In the present case, the ALJ attributed Matheis's considerable mental functional difficulties to the fact that he "was not being adequately treated for his condition." (R. 21)

The ALJ stated he was "convinced" that if Matheis had received appropriate psychiatric treatment, his "functional abilities would be considerably less limiting." (R. 22) These conclusions are wholly unsupported by any medical evidence in the record. Although Dr. Bahnson at one point indicated Matheis likely would benefit from psychiatric therapy as an adjunct to his medications, no physician, treating or consulting, ever indicated Matheis's functional abilities would improve significantly with psychiatric treatment. On the contrary, in April 2005, Dr. Bahnson specifically opined that Matheis's condition was not likely to improve beyond its current level. (*See* R. 269) An ALJ may not reject a treating physician's opinions on the basis of "his or her own credibility judgments, speculation or lay opinion." *Langley v. Barnhart*, 373 F.3d 1116,1121 (10th Cir. 2004) (citation, emphasis omitted). "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, (3d Cir. 2000) (citations, internal quotation marks omitted).

The record illustrates that although Matheis is able to function in a very limited work atmosphere, with generous accommodations, he has not been able to work at the substantial gainful activity level since his alleged onset date, a fact with which the ALJ agreed. (*See* R. 18) The record further indicates Matheis has severe mental impairments that prevent him from performing any type of full-time work, and his condition is unlikely to improve regardless of what treatment he receives. The undersigned finds this is not a proper case for remand because the medical evidence of record overwhelmingly supports an immediate finding of disability and award of benefits.

### V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[1] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the motion for remand (Doc. No. 14) re denied, the Commissioner's decision be reversed, and this case be remanded for an immediate determination of disability and award of benefits from August 30, 2004.

**IT IS SO ORDERED.**

**DATED** this 20th day of July, 2009.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[1] Objections must specify the parts of the report and recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.